696 So.2d 211 (1997)
STATE of Louisiana
v.
Kathryn Joe PETERSON.
No. CR96-1663.
Court of Appeal of Louisiana, Third Circuit.
June 4, 1997.
*212 Charles F. Wagner, Dist. Atty., for State.
John Michael Lawrence, Shreveport, for Kathryn Joe Peterson.
Before SAUNDERS, WOODARD and AMY, JJ.
WOODARD, Judge.
Defendants, Kathryn Joe Peterson and Darrell Wayne Phillips, Sr., appeal their conviction and sentence for indecent behavior with a juvenile. This case was consolidated with State v. Phillips, 96-1664 (La.App. 3 Cir. 6/4/97); 696 So.2d 223. The defendant in the present case, 96-1663, is Kathryn Joe Peterson. The defendant in the companion case, 96-1664, is Darrell Wayne Phillips, Sr. We discuss both cases in this opinion. We affirm as amended.

FACTS
In June of 1994, defendant, Darrell Phillips, moved into defendant Kathryn Peterson's home which she shared with her children. One of her children was the victim herein, whom we will call K. The two defendants were involved romantically. In October or November of 1994, Phillips began having sexual intercourse with K., then fourteen, *213 on a regular basis. On some occasions, defendant Peterson would observe or participate. Ultimately, the victim was removed from the home and placed in foster care in March of 1995. Shortly after that time, she began living with Butch and Gloria Peterson, her paternal uncle and aunt.
On July 20, 1995, a true bill was filed, charging the defendants, Darrell Wayne Phillips, Sr. and Kathryn Joe Peterson, with one count of oral sexual battery and one count of molestation of a juvenile, violations of La.R.S. 14:43.3 and 14:81.2, respectively. Although the defendants were tried together, the appeal of each defendant was lodged separately and later consolidated. Each defendant filed a separate brief, but the issues and arguments raised are identical. Thus, we will discuss them together.
On October 10, 1995, the defendants waived formal arraignment and entered pleas of not guilty to all charges. On October 16, 1996, Kathryn Peterson filed an "Application for Appointment of Sanity Commission." On April 30, 1996 at a sanity hearing, a sanity commission found her to be capable to stand trial. After a trial by a jury of six, which was held on May 15 and 16, 1996, both defendants were found not guilty of oral sexual battery. On the charge of molestation of a juvenile, they were found guilty of the responsive verdict of indecent behavior with a juvenile, a violation of La.R.S. 14:81. On May 22, 1996, each defendant was sentenced to serve seven years at hard labor, were ordered to register in accordance with La. R.S. 15:540, et seq., upon their establishment of residence in any parish after release, and were ordered to submit to blood and saliva testing, pursuant to La.R.S. 15:535. The defendants objected to the sentence and moved for a new trial, which the court denied.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. A review of the record reveals three errors patent.
La.Code Crim.P. art. 473 provides:
When the name of the person injured is substantial and not merely descriptive, such as when the injury is to the person, as in murder, rape, or battery, the indictment shall state the true name of the victim or the name, appellation, or nickname by which he is known. If the name, appellation, or nickname of the victim is not known, it is sufficient to so state and to describe him as far as possible. In stating any name of a victim it is sufficient to state a surname, a surname and one or more given names, or a surname and one or more abbreviations or initials of a given name or names.
The offenses with which the defendants were charged were set forth in the indictment as follows:
COUNT ONE:
IN THAT THEY DID BETWEEN NOVEMBER, 1994 AND MARCH, 1995, commit oral sexual battery upon a child under the age of fifteen (15) and being at least three (3) years younger, whose name will be revealed at trial, in violation of LSA-R.S. 14:43.3,
COUNT TWO:
IN THAT THEY DID BETWEEN NOVEMBER, 1994 AND MARCH, 1995, being over the age of seventeen (17), commit a lewd and lascivious act upon the person of a child under the age of seventeen (17) and at least two (2) years younger, whose name will be revealed at trial, with the intent of arousing their sexual desires while in a position of supervision or control over said child, in violation of LSA-R.S. 14:81.2.
Though the name of the victim is not stated, the technical insufficiency of the indictment is harmless error. In State v. James, 305 So.2d 514 (La.1974), the supreme court noted as error patent that the bill of information named a business rather than an individual on a charge of armed robbery. In James, the supreme court concluded:
where in fact an accused has been fairly informed of the charge against him by the indictment and has not been prejudiced by surprise or lack of notice, the technical sufficiency of the indictment may not be questioned after conviction where, as here, no objection was raised to it prior to the verdict and where, without unfairness, the *214 accused may be protected against further prosecution for any offense or offenses charged by it through examination of the pleadings and the evidence in the instant prosecution.
Id. at 516-17.
In the case sub judice, the defendants and the state entered a written joint stipulation revealing that the state had provided a copy of its entire file to the defendants. In this written stipulation, the parties agreed that production of the file constituted full satisfaction of the defendants' Motion for Discovery and Inspection, Motion for Bill of Particulars, Motions for Preliminary Exam and any request for public records, pursuant to La.R.S. 44:1, et seq. There is no indication that the defendants in this case were prejudiced by surprise or lack of notice. For this reason, this error is harmless.
Additionally, the court minutes do not reflect defendant Peterson's presence in court on May 15, 1996. However, the transcript of trial from this date indicates she was present in court. It is well settled that when there is a discrepancy between the minutes and the transcript, the transcript will prevail. State v. Lynch, 441 So.2d 732 (La.1983); State v. Lozado, 594 So.2d 1063 (La.App. 3 Cir.1992). This omission from the court minutes is not recognized as an error patent.
Finally, the trial court is ordered to amend the sentences to give the defendants credit for time served as this was not done. See La.Code Crim.P. art. 882(A).

ASSIGNMENTS OF ERROR
The defendants assert that the trial court erred by:
1. Overruling defendants' objection to the prosecutor's line of questioning as to the state's direct examination of Debra Smith.
2. Overruling defendants' objection to the testimony of Dr. Barrio as an expert in the field of gynecology.
3. Overruling defendants' objection to the testimony of Dr. John Simoneaux as an expert in the field of psychology with an emphasis on child abuse and erred by not granting defendants' motion for mistrial.
4. Overruling defendants' objection to the Court's instructions to the jury.
5. Overruling defendants' objection to sentencing and not granting defendants' Motion for New Trial based on insufficient evidence to sustain a conviction for Indecent Behavior with a Juvenile.

LAW
Since the defendants specifically abandoned assignments of error numbers 1 and 2, we will not consider them.

ASSIGNMENT OF ERROR NUMBER 3
Although defendants concede that the state properly qualified Dr. Simoneaux as an expert in the field of psychology, they contend that the trial court erred in overruling their objection to his testimony as an expert regarding child abuse. They argue that the expertise described as "with an emphasis on child abuse" was unfairly prejudicial and should have been excluded as inadmissable under La.Code Evid. art. 608.
On the other hand, the state asserts that the defense did not object to the qualification of Dr. John Simoneaux as an expert with an emphasis on child abuse. The state urges that the basis of defense counsel's objection was that counsel's questions regarding the polygraph test were being limited.
During questioning of Dr. Simoneaux, Ms. Brown, defense counsel for Kathryn Joe Peterson, asked him if he usually gives children polygraph exams. The prosecutor, Ms. Laing, objected, and Ms. Brown requested that the jury be removed so she could argue her own objection. Notwithstanding, Ms. Brown did not raise her own objection but merely responded to the prosecutor's objection by arguing that she was allowed on cross-examination to question Dr. Simoneaux regarding his area of expertise. Ms. Brown explained that Dr. Simoneaux was there to testify about whether or not he believed the victim was telling the truth when she talked about the sexual abuse and "that's why [she] got to the issue of the polygraph test, strictly *215 to put it in the name as teststerms." Additionally, Ms. Brown explained that she was attempting to cross-examine Dr. Simoneaux on his area of expertise, especially in the area of child sexual abuse.
The trial court denied Ms. Brown this line of questioning because it believed that her questions regarding Dr. Simoneaux's qualifications to testify as an expert were too broad. After the court's ruling, neither defense counsel questioned Dr. Simoneaux further. However, when the state tendered Dr. Simoneaux as an expert in the field of psychology with an emphasis on child abuse, Ms. Brown objected on the grounds she had previously raised. We find that her objection was sufficient to preserve the defendants' claim regarding Dr. Simoneaux's qualification as an expert. See La.Code Crim.P. art. 842.
La.Code Evid. art. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The court accepted Dr. Simoneaux as an expert in the field of psychology with an emphasis in the field of child abuse. In reviewing the appropriateness of that ruling, we note that at the time of trial, Dr. Simoneaux had been a practicing psychologist for about twelve years. He has a Masters and Ph.D. in psychology. Shortly after he was licensed, he worked at Central State Hospital as a staff psychologist in the adolescent unit for approximately one year. According to Dr. Simoneaux, he worked with seriously disturbed children at that hospital. He, then, worked as the program director on an adult female service for a year. At that point, he returned to the adolescent unit and served as director for five years. He explained that he consulted at Central State Hospital in the Adolescent and Children Service at Huey P. Long Hospital in the Acute Psychiatric Unit, at Cane River Children's Home in Natchitoches, and with virtually all of the parish offices of community services. Through the Office of Community Services and Child Protection, he did substantial work with children. Dr. Simoneaux advised that he evaluates children and adolescents frequently. He performed five or six hundred evaluations in the previous year, of which seventy-percent were minors. He stated that during his evaluations, he does inquire whether the children may have been physically or sexually abused. In the past five years, Dr. Simoneaux estimated that he had attended one hundred to one hundred and fifty hours of continuing education in the area of sexual and physical abuse of children and that he had been qualified as an expert many times in the field of psychology with specific emphasis on children and adolescents.
Based on Dr. Simoneaux's education, training and experience, this court determines that the trial court did not err in allowing him to testify as an expert in the field of psychology with an emphasis on child abuse. Further, we note that La.Code Evid. art. 608 is not relevant to the issue of Dr. Simoneaux's qualification as an expert, as defendants propose that it is.
In this assignment of error, the defendants additionally complain about the trial court's denial of their motion for a mistrial, asserting that the state was trying to place in the record evidence prohibited by La.Code Evid. art. 704, which provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
The defendants moved for a mistrial "due to the court's admitting as evidence the testimony of Dr. John Simoneaux, which related to the ultimate issue to be decided by the jury, the guilt or innocence of the accused." The defendants contend that Dr. Simoneaux's testimony, detailed below and in which he revealed that he believed the victim, was used to bolster the victim's testimony and to rehabilitate the weakness of her contradictory statements about her sexual relationship with her boyfriend and her failure to include her allegations about the defendants in one of her initial statements. *216 According to the defendants, if the jury believed Dr. Simoneaux could vouch for the victim's credibility, then his testimony was on the ultimate issue of the guilt or innocence of the defendants.
Dr. Simoneaux testified on direct examination that he saw K. on June 16, 1995 and that she told him that she had been sexually abused by her mother's boyfriend, Darrell, and that her mother would occasionally participate by kissing her and fondling her breasts. Later, during Dr. Simoneaux's testimony, he explained that children who fabricate allegations of sexual abuse typically relate it in a manner that is "kind of a litany," like a story that is told the same way every time. Further, in response to the prosecutor's question, Dr. Simoneaux responded that when he witnessed "a litany" that he would write in his evaluation that the child had fabricated the sexual abuse allegations. He stated that this is not the way the victim presented her version of events, acknowledging that he only heard her tell it once, thus, it was his conclusion that the victim had not fabricated her story. When the prosecutor later asked Dr. Simoneaux if he expected K. to report the abuse in the same manner each time, he said he did not because that is not what he sees clinically and explained:
Okay. Part of my work is I doI do do therapy, some therapy with sexually abused girls. I have a group that I've been doing for the last four years in Vernon Parish. So I hearII get to know them fairly well, and I hear theirtheir statements and reports over a span of quite a long time. Some of these girls have been in the group for two years. And I
BY MS. BROWN:
II'm going to make an objection again, Your Honor, that this is really beyond the scope of the question that was asked.
BY THE COURT:
Overruled. It's foundation for the testimony, conclusion and opinions he's about to make. Proceed.
[BY DOCTOR SIMONEAUX]
And in the course of that group, I'm continuing to hear new accounts. And and, in many cases, these are cases where people have pled guilty. So I know, you know, the reports are valid.
At this point, Ms. Brown moved for a mistrial on the following grounds:
This man just sat on the witness stand, beyond my initial objection, and talked about not only other crimes evidence, but that he's declared himself an expert in testimony on cases where people have already pled guilty. If that does not send a prejudicial affect to the jury, I don't know what could. And there is no possible way that any question that I could possibly ask that man would take the skin out of their mind. No admonition from thefrom the judge that would take out of their mind that this man is an expert on hearing from children in cases where people have pled guilty or been prosecuted and pled guilty already. ThisI'mmistrial. I mean, absolutethere isthere is no possible way to unring that bell. And if it was a small factor, but we are here for the sole purpose of determining whether or not these people are innocent or guilty.
In addition to arguing that Dr. Simoneaux did not testify as to other crimes evidence as to the two defendants on trial, the prosecutor asserted, "[h]e's further testified as to children who in fact fabricate people who are not guilty." According to the prosecutor, Dr. Simoneaux did not state that the defendants were guilty; he just said he had cases where he has objective evidence. The trial court denied the motion for mistrial, concluding that Dr. Simoneaux was talking about the group of girls in Vernon Parish.
Defense counsel also made the following additional objections after the request for a mistrial was denied:
BY MS. BROWN:
Okay. My second objection, Your Honor, goes to any further testimony from this witness. I want to move to strike from thethe record his testimony about, "Even cases where people have been prosecuted before." I want that out of the record.
BY THE COURT:
Denied.

*217 BY MS. BROWN:
And my secondmy third objection, Your Honor, goes to any further testimony from this witness whatsoever because he'she's prejudiced the jury already. I think that he has spoiled the jury, and any possibility of that my clients getting a fair trial at this point, my client is getting a fair trial.
BY THE COURT:
All motions denied.
The defense counsel's above additional objections and motion for a mistrial did not involve the points in question which the defendants now raise before this court. Therefore, we cannot consider them on appeal. In State v. West, 419 So.2d 868 (La.1982), the supreme court stated:
We have held that the grounds of counsel's objections must be sufficiently brought to the attention of the trial judge to allow him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. State v. Harris, 414 So.2d 325 (La.1982); State v. Davis, 357 So.2d 1125 (La.1978). Therefore, a new ground for objection cannot be presented for the first time on appeal. State v. Harris, supra; State v. Davis, supra; State v. Monroe, 397 So.2d 1258 (La.1981); State v. Bodley, 394 So.2d 584 (La.1981). It is settled that a new basis for an objection cannot be substituted on appeal and that only the grounds made known to the trial judge at the time of his ruling may be relied on by this court. State v. Wright, 410 So.2d 1092 (La.1982); State v. Baylis, 388 So.2d 713 (La.1980); State v. Woodard, 387 So.2d 1066 (La.1980).
Id. at 876.
This court applied this principle in State v. Guidry, 94-678 (La.App. 3 Cir. 12/7/94); 647 So.2d 502 in a situation similar to the present. In Guidry, the defendant contended that the trial court erred in allowing a psychometrist to testify as an expert in the field of counseling abused children. Additionally, the defendant insisted that the psychometrist's testimony bolstered the victim's testimony. This court noted that the defendant had failed to object to this witness' testimony after she was accepted as an expert. Thus, it refused to consider the additional aspect of the defendant's argument.
In the instant case, defense counsel did not object when Dr. Simoneaux testified that he did not believe the victim fabricated her story. Rather, the objection came at a later point, when Dr. Simoneaux was explaining that he did not expect that the victim in this case would relate the same story on later occasions based on his observation of the girls in Vernon Parish.
Since the defendants are now claiming that Dr. Simoneaux gave an opinion on the ultimate issue in this case, they should have objected when he initially said that he did not believe the victim fabricated her story. Their failure to do so, prohibits us from considering it on appeal. Id.

ASSIGNMENT OF ERROR NUMBER 4
The defendants contend that the trial court erred in overruling their objection to the jury instruction given by the court concerning witness bias. Pursuant to La.Code Crim.P. art. 801, defense counsel for defendant Darrell Phillips requested the following special charge:
The testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction or acquittal, that the witness is prejudiced, or that the witness has any other reason or motive for not telling the truth.
The defendants' theory was that the victim fabricated her story and that her motive for doing so was that she blamed them for the death of her father and that K. and her aunt were racially biased against Mr. Phillips. Thus, they believe that the court's charge was not sufficient to cover these issues and to inform the jury that a witness' testimony may be discredited if he or she has a reason for not telling the truth. In denying the defendants' request for the special instruction, the trial court stated that his boilerplate language addresses the issue of bias and gives the jury discretion to determine the credibility of witnesses. He believed that to give any further instruction would be over accentuating the issues.
*218 The following jury instructions were given regarding witness credibility:
As jurors, you alone determine the weight and credibility of the evidence. As the only judges of the credibility of the witnesses and of the weight of their testimonyand the weight that their testimony deserves, you should scrutinize, carefully, the testimony and the circumstances under which the witness is testifying.
In evaluating the testimony of a witness, you must consider his or her ability and opportunity to observe and remember the matter about which he or she testifies, their manner while testifying, or any reason they may have for testifying for or against the State or defendant, and the extent to which the testimony is supported or contradicted by the evidence.
Additionally, the testimony of a witness may be discredited by showing that the witness made a prior statement which contradicts or is inconsistent with his or her present testimony. Such prior statements are admitted only to attempt to discredit the witness, not to show that the statements are true.
(Emphasis added.)
La.Code Crim.P. art. 807 governs special requested jury instructions. It provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
According to La.Code Crim.P. art. 807, a trial court need not read a requested charge "if it is included in the general charge." We find that the defendants' requested jury instruction was sufficiently covered by the general charge on witness credibility.

ASSIGNMENT OF ERROR NUMBER 5
The defendants claim that the trial court erred in denying their Motion for New Trial "based on insufficient evidence to sustain a conviction for Indecent Behavior with a Juvenile on the basis of contradictory statements from a single witness who had a motive to fabricate the incident." Additionally, they contend that there was no physical or forensic evidence to corroborate the victim's testimony.
Initially, this court notes that "[a] motion for new trial presents only the issue of the weight of the evidence." State v. Evans, 27,750, p. 4 (La.App. 2 Cir. 2/28/96); 669 So.2d 719, 722. The issue of sufficiency of the evidence is properly raised in a motion for post-verdict judgment of acquittal. See La.Code Crim.P. art. 821 and State v. Allen, 95-1515 (La.App. 1 Cir. 6/28/96); 677 So.2d 709.
As noted in the defendants' brief, counsel for defendant Peterson made an oral motion for a new trial on May 22, 1996, after sentence was imposed. At that time, counsel neither specified the grounds upon which the motion was based, nor did she make reference to a pending Motion for New Trial. The court denied her motion without reasons. A written "Joint Motion for New Trial" was filed on behalf of both defendants on the same day as the oral motion on the grounds that the verdict was contrary to the law and evidence and that the ends of justice would be served by the granting of a new trial, citing La.Code Crim.P. arts. 851(1) and (5). On June 3, 1996, the trial court issued a written ruling denying the motion, with no reasons being given.
La.Code Crim.P. arts. 852 and 853 require a motion for new trial to be written and to be filed and disposed of prior to sentencing. An exception to this time limitation is made if the grounds for the motion are that new material and evidence have been discovered. This was not the situation in the present case. Thus, the defendants' contention is without merit.

*219 SUFFICIENCY OF THE EVIDENCE REVIEW
The defendants concede that counsel for defendant Peterson made an oral motion for a new trial, but failed to specify grounds. Despite this, they urge this court to review the sufficiency of the evidence for their conviction of indecent behavior with a juvenile because "there were contradictory statements made by a single witness who had motive to fabricate the story," and there was no physical evidence to corroborate the victim's trial testimony. For the reasons set forth in State v. Hearold, 603 So.2d 731 (La.1992), we will first address the defendants' claim concerning insufficient evidence.
In order for the state to obtain a conviction, it must prove every element of the crime beyond a reasonable doubt. The defendants were convicted of indecent behavior with a juvenile, a violation of La.R.S. 14:81. This statute provides as follows:
A. Indecent behavior with juveniles is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child's age shall not be a defense.
On March 15, 1995, Rose Walker, an investigator with the Office of Child Protection, was assigned to investigate the Peterson family. As a result of Ms. Walker's investigation, she removed Ms. Peterson's children (K., Brett and an infant), placed them in foster care and ultimately placed them in the care of a paternal uncle and aunt, Butch and Gloria Peterson. According to Ms. Walker, when the children were initially taken into state custody, K. was taken to Pediatric Associates for a medical examination.
K. was fifteen at the time of trial. In April of 1994, her father, Richard, died. At the time of his death, K., her parents and her brother, Brett, were all living together. In June, Darrell Phillips moved into the home. K. testified that she did not want him there and that they did not get along in the beginning. According to her, in October or November of 1994, Darrell started sexually abusing her. On the first occasion, he entered her room and told her that he and her mother had decided it would be all right if they had sex. After that, he made her have sex with him. This was her first sexual experience.
When asked to describe the physical contact that took place, she stated that Darrell kissed her and fondled her breast. When asked what she meant by having sex, if she meant sexual intercourse, she responded affirmatively. She described that approximately two to three days later, Darrell made her have sex with him again. This would happen three to four times a week, and the same thing happened every time. Darrell would make her hold him around his back, kiss him on the lips and also hold his penis in her hand. Sometimes, K.'s mother would be present and on some occasions, this took place in the mother's room. Defendant, Kathryn Peterson, would watch and sometimes participate by kissing K. and fondling her breast while Darrell would have sexual intercourse, either with K. or with Kathryn. The last time K. recalled this happening was the week before foster care came and picked up the children. K. estimated that her mother was involved about half of the time.
Brett testified that he had observed Darrell and K., and sometimes his mother, go into either K.'s or his mother's room and lock the door three or four times a week, and, during that time, they would tell him to go outside and play with his friends. He said that this would take place during the day and that he was usually required to go to bed by 9:30 p.m.
Around March 30, 1995, K. went into foster care, which lasted three or four days. From there, she went to live with her aunt and uncle. While she was in foster care, she submitted to a medical examination and told the doctor that she had sex before, but she did not tell her it was Darrell because she was scared that if she told and she had to go back (presumably to her home) that Darrell might hurt them.
*220 Not long after living with her aunt and uncle, K. spoke to Detective Eddie Palmer. The first time she spoke with him, she did not say anything about Darrell and the sexual activity for fear Darrell would hurt them if she had to go back. Notwithstanding, weeks later, she told Detective Palmer that Darrell made her have sex with him.
On cross-examination, Mr. Johnson first read Detective Palmer's specific questions posed to K. at their first meeting. K. recalled that her answer was "No" when Detective Palmer asked if Darrell had ever sexually abused her or whether he had ever made a pass at her or put his hand anywhere on her privates. However, she could not recall her response when Detective Palmer asked her if she was scared of Darrell or if he had ever done anything or threatened her in any way. Mr. Johnson read from the statement that her response was, "Not, uh, Uh-uh." Later in the first interview with Detective Palmer, Palmer again asked K. if Darrell had threatened her in any way. On cross-examination, she could not recall her response, but Mr. Johnson indicated that she had said, "No."
K. acknowledged that her second statement to Detective Palmer was completely different from her first. She explained that she had told the detective about the abuse at the time she did because she knew that her family (aunt and uncle and other relatives) were supporting her. K. related that she had been very close to her aunt and uncle before her father's death and saw them a lot. After she moved back home, she did not see them as frequently, and after Darrell moved in, she hardly ever saw them.
K. saw Dr. John Simoneaux for a psychological evaluation in June of 1995; she remembered telling him that she thought her father shot himself because he believed her mother was seeing Darrell, she believed it to be true because Darrell moved into the house right after her father died, and that she had never liked Darrell and did not want him to move in.
K.'s mother had a baby on March 13, 1995. Mr. Johnson asked K. if she had made certain statements, like "the baby is not bright enough," to Darrell. K. denied having made them. Instead, she said that she was not upset that the baby was not "bright enough" and that the baby was interracial. When Mr. Johnson asked her if she dislikes Darrell, she responded, "sometimes." She confirmed that family members and friends disliked him from the first time he moved in with K.'s family. They told her negative things about him, and they did not like the fact that he was black. She explained that her family does not dislike black people, but they did not like the idea that a black person was a member of their family. She said that her family never used racial slurs about Darrell and did not make racial comments about him, but that she had a feeling they did not like him because he was black. When asked if it mattered to her if Darrell was black, she said, "sometimes." Further, in response to a question, she said she would have been just as angry if Darrell had been a white man that had moved in with her mother after her father's death. Although she acknowledged that some of the neighbors, with whom she attended school, knew that a black man was living at her house, she maintained that this did not embarrass her.
She was asked if before Darrell moved into the home, she and her mother had a decent relationship. She responded, "sometimes." On cross-examination by Ms. Brown, K. stated that her mother had never kissed her on the mouth or fondled her breasts prior to the time when Darrell came to live with them. She affirmed that she was also angry because she had just lost her father, that she never thought of Darrell as a stepfather, and that she did not want him and her mother to get married. Additionally, she believed that if Darrell had not been in the picture, she would have continued to see more of her aunt and uncle with whom she had been used to spending a great deal of time.
Ms. Brown asked K. about the first time she and Darrell had sex. K. related that the incidents would take place around eleven o'clock at night, and it was dark in the room except for her clock. She admitted that, prior to giving the second statement to Detective Palmer on June 8, she had told someone that she had sex with a fifteen-year-old boy in the neighborhood. However, she confirmed that this boy did not exist and that *221 she had made up the story. One of those to whom she had related this story was Dr. Marta Berio, qualified as an expert in the field of general pediatrics. Dr. Berio examined K. on March 31, 1995. At the time of her examination, K. told her that she had been sexually involved with a fifteen-year-old boy who had moved and that she had not had any sexual encounters for two months. Dr. Berio recommended that K. see a psychologist.
K. did so. She met with Dr. Simoneaux. In discussing the first sexual encounter with Darrell, K. described it much as she did when she testified; however, Dr. Simoneaux's testimony added a few facts which K. did not discuss. For example, Dr. Simoneaux testified that K. told him that when Darrell first approached her in her bedroom, she backed up to the corner of the wall and began to cry. Darrell "got an attitude" and made her take off her clothes. Out of fear, she complied. After she removed her clothes, Darrell removed his, got on top of her and performed intercourse. She said the intercourse was painful and that there was some bleeding. Dr. Simoneaux's account of later incidents was very similar to K.'s testimony, but K. told Dr. Simoneaux the acts also involved oral sex.
Dr. Simoneaux believed that K.'s emotional expression was consistent with what she was saying. He administered a Personal Problems Checklist; K. indicated there were problems with her stepfather, that she was unable to talk to her parents, and that she felt too much was expected of her.
He also performed a Multiphasic Personality Inventory, which involved a series of true/false questions. The test is computer-scored and produces a graph. K. generated a "defense profile" which indicated she was really trying to tell herself and Dr. Simoneaux that everything was fine and that there were no problems. Dr. Simoneaux explained that there is no specific set of syndrome observations seen in children who are sexually abused, as people deal with trauma in different ways. He revealed that what he looks for are indicia in their reporting which seem to be almost peculiar to sexually abused children; behavioral characteristics are not that critical. Thus, Dr. Simoneaux looked more for the specific kinds of things K. said, the way she said them, and when she said them. He stated that children who make up allegations of sexual abuse typically tell it like a litany, in pretty much the same way every time; that when he had examined children in the past who had exhibited this "type of litany," he determined that they had fabricated the sexual abuse allegations.
He pointed out that K. had not presented her account as a litany but rather, bit by bit, as he had asked her questions. He acknowledged that he had seen K. only once. Nevertheless, he said that he would be surprised if she reported her story in the same words and in the same manner each time because this is not what he observed clinically. He drew on his experience and explained that he does therapy on sexually abused girls and that he has a group of girls in therapy for four years in Vernon Parish. He continues to hear new accounts from them, and in many of the cases, the perpetrators have pled guilty, therefore, he knows that their reports are valid.
According to Dr. Simoneaux, it is not unusual for sexual abuse victims to give additional details, previously not disclosed, or to not disclose details every single time they account their story. He found K.'s presentation consistent with her story of sexual abuse, and he affirmed that it is not unusual for a sexual abuse victim to name someone other than the perpetrator and then subsequently change the story. He said that the fact that a child previously denied sexual abuse is more confirmatory than "contrary," and the average length of time between the last abuse episode and the revelation of abuse is seven years. One of the reasons Dr. Simoneaux thought it was so long was because victims generally do not reveal anything until they are adults and feel safe. Thus, safety is a major reason for initial denial. K. clearly communicated to Dr. Simoneaux that she was scared of Darrell.
Finally, Dr. Simoneaux stated that, although he had not made a specific inquiry, he did not get any indication from K. that the race of Darrell Phillips was an issue to her.
*222 The only comment made about race was that made by her aunt.
Defense counsel pointed out inconsistencies between K's. testimony and what she had told Dr. Simoneaux. For example, at trial K. said that the first time, Darrell had sex with her, he still had on a tee shirt and that she did not recall whether she had bled.
It is not this court's place to second guess the credibility determination made by the trier of fact beyond the sufficiency evaluations under the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. See State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983), citing State v. Richardson, 425 So.2d 1228 (La.1983).
After a thorough study of the record, we find that the test for sufficiency of evidence to prove the elements of indecent behavior with a juvenile were met as to both defendants in this case. Thus, we find this assignment of error to be without merit.

THE TRIAL COURT'S FAILURE TO REQUEST A PRESENTENCE INVESTIGATION REPORT
Defendants note that they objected to the trial court's failure to request a presentence investigation report to aid in sentencing them. Additionally, they request a review of their sentences as an error patent because no Motion for Reconsideration of Sentence was filed prior to this appeal.
Contrary to the defendants' assertion, the court notes that a Joint Motion to Reconsider Sentence was filed on May 22, 1996, the same day the defendants were sentenced. The only claim raised in the motion was the excessiveness of the defendants' sentences. On June 3, 1996, the court issued a written denial of the motion.
We find no error in the court's ruling. The trial court is not required to order a presentence investigation report. This is purely within its discretion. See La. Code Crim.P. art. 875(A)(1) and State v. Wimberly, 414 So.2d 666 (La.1982).
In the defendants' Joint Motion to Reconsider Sentence, they contended their seven-year sentences were excessive. In their brief before this court, they argue that because the trial court had only one sentencing factor as a basis for the sentence, namely the facts of the offense, that their sentences should be reversed and their cases remanded for a proper sentencing hearing. Though counsel's argument is not entirely clear, it appears that the basis for this argument is that the trial court did not consider the Sentencing Guidelines and failed to state the considerations taken into account and the factual basis for imposition of the sentence. Because these particular claims were not raised in the defendants' Motion to Reconsider, and no court has recognized these as errors patent, the defendants are precluded at this point from raising these additional claims. See La.Code Crim.P. art. 881.1(D). Further, we note that although the defendants alleged that their sentences were excessive in their Joint Motion to Reconsider Sentence, they do not do so on appeal. Thus, we are precluded from addressing this issue. La.Code Crim.P. art 920.
Regarding the presentence investigation, on the day of sentencing, counsel for defendant Peterson asked that she be allowed to present the court with a presentence investigation. The court responded that it did not deem a presentence investigation report necessary, because this was a jury trial, and it was responding to the verdict of the jury.

CONCLUSION
For the foregoing reasons, the defendants' convictions and sentences are affirmed. The trial court is instructed to amend the commitment and minute entry of the sentences to reflect that the defendants are given credit for time served.
AFFIRMED WITH INSTRUCTIONS.