# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**23-135**

**STATE OF LOUISIANA**

**VERSUS**

**KENDRICK NELSON SHEPHERD**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 16635-18
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**LEDRICKA J. THIERRY
JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Gary J. Ortego, Ledricka J. Thierry and Guy E. Bradberry, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Stephen C. Dwight, District Attorney for Calcasieu Parish**
**Karen McLellan, Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA  70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**


**G. Paul Marx**
**Louisiana Appellate Project**
**P.O. Box 82389**
**Lafayette, LA  70598**
**(337) 237-2538**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Kendrick Nelson Shepherd**

**THIERRY, Judge.**

## FACTS AND PROCEDURAL HISTORY

On July 26, 2018, Defendant, Kendrick Nelson Shepherd, entered a Valero Gas Station/Smoker's Haven Convenience Store located on Belden Street in Lake Charles, Louisiana. As the cashier opened the cash register, Defendant struck him in the head with a beer bottle. While the cashier was lying on the floor, Defendant reached over the counter and removed money from the register. He then stood over the fallen cashier and demanded more money. After going to the back of the store, Defendant fled the scene. The events were captured on video surveillance. Defendant was seen on the video wearing a white top and blue shorts.

Several days later, another robbery was committed at a nearby Exxon Gas Station and the perpetrator was also wearing a white top and blue shorts. That robbery was also captured on video.

On August 4, 2018, Defendant was observed in the area wearing the same blue shorts as observed in both videos. He was arrested by law enforcement. During an interrogation, the police contended Defendant acknowledged that it was him in still shots he was shown from the Valero robbery and confessed to that robbery. Defendant denies on appeal that he confessed to the crime.

On September 17, 2018, Defendant was charged by bill of information with one count of armed robbery, a violation of La.R.S. 14:64. On April 10, 2019, upon Defendant's motion, the trial court appointed a sanity commission to determine Defendant's capacity to proceed. This order appointed Dr. James Anderson and Dr. Patrick Hayes to serve on the sanity commission. Thereafter, on October 23, 2019, the trial court appointed Dr. Andrew Thrasher to the sanity commission. On July 1, 2020, Defendant was found competent to proceed. On March 28, 2022, Defendant filed a motion for the appointment of a second sanity commission to determine his

capacity to proceed. The trial court denied the motion on that same date. On April 28, 2022, Defendant changed his plea from not guilty to not guilty and not guilty by reason of insanity. Subsequently, after a six-day trial ending on May 6, 2022, Defendant was found guilty of armed robbery by a unanimous jury.

The trial court denied a motion for new trial filed by Defendant. At the sentencing hearing, the State filed a habitual offender bill, charging Defendant as a fourth or subsequent habitual offender, to which Defendant entered a denial. The minutes of August 19, 2022, indicate the trial court found Defendant to be a habitual offender and sentenced Defendant to life imprisonment, without benefit of probation, parole, or suspension of sentence. On September 1, 2022, the trial court granted Defendant an appeal.

On appeal, Defendant alleges five assignments of error—one challenging the sufficiency of the evidence, one asserting the admission of improper expert testimony, one challenging the trial court's failure to grant a mistrial after the admission of improper other crimes evidence, one challenging the trial court's improper questioning of Defendant about his right to testify, and one challenging the trial court's adjudication of Defendant as a fourth habitual offender.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we note that both the minutes of sentencing and the cover page for the sentencing hearing refer to the sentencing as a "resentencing." It is clear from the record as a whole, however, that no other sentence was imposed. On the day of the jury's verdict (May 6, 2022), the trial court scheduled sentencing for July 8, 2022. At the hearing on July 8, 2022, Defendant's motion for new trial was argued by counsel and denied by the trial court. The State then filed a habitual offender bill of information, and a

2

habitual offender hearing was scheduled for August 19, 2022. The habitual offender hearing was held and Defendant was sentenced on August 19, 2022. It is apparent from the dates set by the trial court, and the dates on which the habitual offender hearing and sentencing actually took place, that no other sentencing took place before the August 19, 2022 sentencing. Thus, both the minutes and the cover page of the August 19, 2022 sentencing mistakenly refer to the hearing as a "resentencing." Accordingly, this court orders the trial court to correct the minutes to delete the reference to the sentencing as a "resentencing."

Additionally, the minutes for August 19, 2022, state that the case was remanded from the Louisiana Third Circuit Court of Appeal. This court has no record of a remand for resentencing in this case, and with the fact that the August 19, 2022 sentencing hearing took place within three and one-half months of Defendant's conviction, there was not sufficient time for the case to have been lodged in this court and subsequently remanded. Accordingly, the minutes of sentencing should be amended to delete the statement that the case was remanded from the Louisiana Third Circuit Court of Appeal.

### ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant asserts the State failed to prove his identity as the perpetrator of the armed robbery for which he is charged and of the armed robbery that occurred a few days later. According to Defendant, no eyewitness identified him, and there was no formal process to establish identification. The State maintains it negated any reasonable probability of misidentification.

*Standard of Review*

In reviewing the sufficiency of evidence, this court has set forth the standard of review as follows:

3

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting

*State v. Freeman*, 01-997, pp. 2–3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

The State is required "to negate any reasonable probability of

misidentification" when the key issue in a case is the defendant's identity. *State v.*

*Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary,*

03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682

(2006); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S.

940, 122 S.Ct. 1323 (2002)). However, "[p]ositive identification by only one witness

is sufficient to support a conviction. It is the factfinder who weighs the respective

credibility of the witnesses, and this court will generally not second-guess those

determinations." *Id.* at 1051 (citations omitted).

*Evidence Presented at Trial*

The first witness to testify was the cashier and victim at the Valero, Ishan

Kahn Silwal. The victim described the incident that took place on that date as

follows:

The guy had walked in. There was another guy that came after him, and he took his stuff and I did his transaction; but then I had the -

4

- I was on the counter and putting my money inside the register, whatever the other person had given me. At that time somebody came around the table, struck me with a beer bottle, and I instantly fell to the ground.

He took all the money from the register and stuff that was change from the bag and demanded me [sic] for more money, for which I responded with, go to the cooler. Then he went for the cooler, that's when I got up and tried to call the police. Then he ran away from the store.

The victim identified S-1 as a surveillance video that accurately depicted the robbery. The video was then played for the jury. The video clearly shows the robber going behind the cash register, hitting the cashier with a bottle, quickly gathering items, and then walking away while carrying stuff in his hands. The video offered a clear view of the robber. On cross-examination, the victim did acknowledge that he saw "quite a few" guys wearing gym shorts while he worked at Valero.

Sergeant Dustin Gaudet testified that on the day of the robbery, he was a violent crimes detective with the Lake Charles Police Department. According to Sergeant Gaudet, he became involved in the robbery that occurred on July 26, 2018, at the Valero. When Sergeant Gaudet arrived at the scene around 7:00 a.m., he learned the following from another detective:

So I learned that about six in the morning a vehicle pulled up to the gas station. One subject got out of the gas station [sic] and went inside. He walked around for a bit with another customer was in there [sic] at the same time. The two of them walked around.

The suspect in particular went back to the cooler and got a large beer bottle and continued to walk around until the actual customer left. Then the suspect, holding the beer bottle, walked behind the counter, struck the clerk in the head, and then took money from the register, took a bag that contained about $300 in change from behind the register, and also took some cartons of Kool cigarettes.

Sergeant Gaudet testified that he reviewed the surveillance video but was not immediately able to identify a suspect. The sergeant put out a bulletin and a media release asking for help identifying the subject. The bulletin contained pictures of the

5

suspect obtained from the surveillance video. Shortly after the bulletin and media release were issued, Sergeant Gaudet left for vacation. Upon returning, he learned that an arrest had been made. On cross-examination, he agreed that blue gym shorts are a common garment.

Corporal Chad Smith, with the Lake Charles Police Department, was "dealing with another incident" on July 26, 2018, when he was flagged down and told the robbery had occurred. Corporal Smith went inside the store and found the clerk sitting behind the register holding his head. The corporal learned that the robbery had just occurred and that the suspect had left. Corporal Smith identified State's exhibits four through nine as photos that fairly and accurately depict the scene as he remembered. When asked if there was anything in the picture of the suspect that stuck out to him, Corporal Smith replied that the suspect was wearing a white shirt and "like royal blue gym or basketball shorts."

A few days later, on July 31, 2018, Corporal Smith investigated another robbery that occurred at the "Grab-N-Geaux" Exxon on North Martin Luther King. When asked what he learned upon arriving at the scene of the second robbery, Corporal Smith replied:

> I learned that there had been an altercation between the clerk and the suspect; and after the altercation went on for a few minutes, the suspect fled on foot. We learned that he was also wearing the same type of blue gym shorts as the robbery I had worked just four or five days prior to.

On cross, Corporal Smith testified that the suspect in both robberies was "similar, with similar figure, similar clothing." When asked if he testified on direct "that it was specifically the same blue shorts[,]" Corporal Smith replied:

A.      Yes.

Q.      Similar blue shorts, and that's how you identified both subjects?

A.      Yes.

6

On re-direct, the following colloquy took place:

Q.    I just have one question for you.  Was it just the shorts that kind of led you to believe that these were the same suspects, or were there other features that you were able to distinguish?

A.    The suspect's total appearance was similar.  The shorts stood out mostly.

Q.    But there were other things outside of just the blue shorts?

A.    Yes.

The next witness, Biplop Shrestha, testified that he was working at the Exxon on North Martin Luther King that was robbed a few days after the Valero robbery. Mr. Shrestha described the incident as follows:

> Well, it was like a normal day.  I was taking customers.  Then suddenly there was a guy who tried to snatch the money from the register.  I tried to get his hand away, but instead he came towards me inside the counter and there was some struggle with him and I.  Yeah.
> He was trying to snatch the money from out of the register, but I was trying to block him.  Then I was trying to get some help from around just calling somebody, but nobody responded.  Then the guy left from going outside to the counter.

Mr. Shrestha identified S-10 as the surveillance video from the day of the robbery, and the video was then introduced to the jury.  When asked if he recognized "this guy[,]" Mr. Shrestha answered, "I don't remember his face."  Mr. Shrestha did not remember if he told police that the "guy" matched the description he had seen previously.

The next witness, Corporal Ryan Gaspard of the Lake Charles Police Department, testified that he was involved in Defendant's arrest on August 4, 2018. Corporal Gaspard testified:

> I took the Enterprise exit from I-10.  Coming into work from my house I travel down Louisiana Avenue.  When I turned down Louisiana Avenue, I see two subjects walking in the middle of the roadway.

7

Initially I was about to stop them whenever I recognized the blue shorts and the build of one of the subjects, Mr. Sheppard.[1]

I decided not to stop him. He's a robbery suspect, so I decided to call for additional units. I made the block, radioed for Officer Smith. I believe he advised he was several minutes away, so I was going to wait for him.

When asked how he recognized the suspect, Corporal Gaspard responded:

A.      His shorts stand out pretty good, blue, black trim with some lighter color around the black and his build, fairly skinny.

Q.      And what did you recognize those things from prior to that day?

A.      The BOLO, the intelligence bulletin.

Corporal Gaspard explained that BOLO means "[b]e on the lookout, an email sent out with pictures and details." Corporal Gaspard identified S-11 as the shorts collected from Defendant the morning he was arrested.

Corporal Gaspard further explained Defendant's arrest:

A.      Like I said, after recognizing he was the possible robbery suspect, I didn't want to go on that one by myself. I make [sic] the block to Bank and Belden and waited there for backup to arrive.

Mr. Shepherd and, I don't know the other subject's name with him, they went to the back of the store. It looked like they saw me, and they parted ways. Mr. Shepherd went towards the back of the store. The other subject went inside. At that time I decided to go out with them so I wouldn't lose sight of them.

Q.      You made contact with Mr. Shepherd?

A.      Correct.

Q.      Please tell the jury about once you made contact with Mr. Shepherd what happened?

A.      So I made contact with him. I had him place his hands on the hood of my police unit, patted him down for weapons. He was fairly compliant. I wanted to detain him. I told him to place his hands behind his back.

As soon as I did that, he took off running. He fled on foot eastbound over Louisiana Avenue into a vacant lot. I deployed my taser

---

[1] This is the spelling used by the court reporter.

only striking him with one dart, which was ineffective. I reloaded. At which time he stumbled. I told him don't get up or he's going to get tased again. He said okay, and then took off running again; at which time I tased him. It was effective, and I put him in handcuffs.

When asked if Defendant said anything in the ride to the detective's division, Corporal Gaspard testified:

> A.     I asked him if he was aware of why I stopped him, if any of the other officers had mentioned anything to him. To which he replied, no. I asked him if he could take a guess; and he said because of the robberies.
>
> Q.     Then what was your response to that?
>
> A.     I don't recall the response to that exactly. I asked him why he would return to one of the stores that he had originally robbed. To which he said, I believe, ["]I'm homeless and it's hard out here.["]

When questioned about the subject's blue shorts on cross-examination, Corporal Gaspard agreed that there are probably thousands of those same shorts. Although he had no idea how many were in Lake Charles, Corporal Gaspard agreed that it could be hundreds. Finally, when asked on re-direct if there was anything else besides the blue shorts that helped him recognize Defendant, Corporal Gaspard replied, "His build was fairly skinny and appeared to be average height."

Detective Sergeant Willie Fontenot testified that he was a violent crimes detective in 2018. On July 31, 2018, Sergeant Fontenot investigated a robbery that occurred on North Gerstner Memorial Boulevard. When asked what he learned about the robbery, Sergeant Fontenot testified:

> Throughout the course of the robbery, I was able to obtain video surveillance. I was able to read the initial officer's statement. The initial officer had just indicated in his report that whenever they were dispatched out there, a suspect entered the convenient store. He had on a white T-shirt. He had some blue basketball shorts on, some tennis shoes.
>
> The subject went to the back of the store. He obtained a honeybun, walked back up to the counter; and once he got to the counter to purchase it, the clerk opened the cash register.

9

At that particular point in time the suspect jumped over the register and there was an altercation that occurred where the suspect was able to obtain approximately $400 in cash; and at that particular point in time, he was able to run out of the store northbound on Gerstner Memorial.

While the officers obtained video surveillance, the store clerk indicated that he recognized the robbery suspect from a media post regarding the July 26, 2018 robbery. The clerk told the officer that the robber was the same person that committed the July 26, 2018 robbery. When asked his impression after viewing the surveillance videos of each robbery, Sergeant Fontenot answered:

Definitely many similarities. They both had on the same clothing; both had on blue shorts; both had the same tennis shoes; and the subject appeared to be the same person, as well as multiple tattoos throughout the arms and face.

On August 4, 2018, Sergeant Fontenot was informed that near the area of the first robbery, Corporal Gaspard observed a black male, wearing blue shorts and matching the description of the suspect in the two previous robberies. Corporal Gaspard identified the male as Kendrick Shepherd.

Sergeant Fontenot identified S-12 as his interview of Defendant, whom Sergeant Fontenot identified in court. Although the entire interview was introduced into the record, only a portion of the transcript was published to the jury. During the interview, Defendant said he was homeless. Sergeant Fontenot informed Defendant that he was approached by police at 5:00 that morning because he matched the description of the person who committed a robbery at that same location. When asked what happened during the robbery at that same location on July 26, 2018, Defendant stated that he did not remember and that all he knew was that he was homeless and needed to get anything he could by any means.

When Sergeant Fontenot showed Defendant a still picture of the robbery suspect and asked if that was him, Defendant stared at the picture but did not

10

respond. When asked again what he did in the store that day, Defendant said he did not remember but that his intention was only to get money to get something to eat. Defendant said that he was not robbing someone but was just trying to get something to eat. When asked if he got the beer bottle so he could get money whenever the clerk opened the register, Defendant nodded his head, saying "Yeah, yeah." Defendant denied that he intended to hit the clerk and claimed that his intention was only to get the money to survive. Defendant said his intention was not to hurt anyone.

Sergeant Fontenot then asked Defendant about the robbery that happened a few days later at an Exxon station. Defendant stated that he did not remember that robbery. When Sergeant Fontenot showed Defendant pictures and asked if that was him, Defendant nodded slightly. Defendant reiterated that he was not trying to harm anyone but had nowhere to go.

Defendant agreed with Sergeant Fontenot that there were victims as a result of the robberies. Sergeant Fontenot told Defendant that when he jumped over the counter and hit the clerk over the head with a bottle, he looked like some kind of animal. Defendant responded that he was an animal and had no one to help him. Defendant said that his girlfriend knew he was homeless but did not know that he had been "pulling these little acts" to try to eat. When Sergeant Fontenot asked Defendant if his girlfriend knew about the robberies, Defendant stated that hardly anyone knew.

When Sergeant Fontenot asked Defendant the identity of the other person in the pictures, Defendant stated that it was "G." Defendant said he met "G" about six months ago. Defendant told Sergeant Fontenot that "G" picked him up before the robbery. When Sergeant Fontenot asked Defendant if he got into the car with "G" after the robbery, Defendant said "yes." Defendant said "G" told him to get in, and

11

they "burned off." Defendant told Sergeant Fontenot that "G" pulled a gun on him before they went into the store.

When asked why he ran from police that morning, Defendant said he did not run, he walked. Defendant said he did not want to go to jail. When Sergeant Fontenot asked if he knew why he was being detained, Defendant said, "No." Sergeant Fontenot asked Defendant if he knew it was for the robberies, and Defendant responded that in actuality, "they" did not know who committed the robberies. When Sergeant Fontenot said, "Your face was on the damn camera," Defendant responded, "But you didn't know my name." Defendant said he had been doing these "acts" to try to get some help. When asked if he had done more than these two, Defendant replied, "No." Defendant said he knew it was not right. Defendant claimed it was the only way he knew to cope. Defendant agreed that he showed violent tendencies by hitting the clerk in the head with a bottle.

At trial, Sergeant Fontenot identified Defendant as the person he interviewed on August 4, 2018. On cross-examination, Sergeant Fontenot agreed that during the interview, Defendant was "laying down on the table and not really responding to much[.]" When asked if Defendant identified the person in the pictures, Sergeant Fontenot responded, "He just nods his head. He never acknowledged." Finally, on re-direct, the following colloquy occurred:

> Q. The Defense asked you when you showed him the photo did he acknowledge whether or not that was him or not?
>
> A. Yes, sir.
>
> Q. You said he nodded his head.
>
> A. Yeah, he nodded.
>
> Q. But then after that, did he admit and talk about it?
>
> A. He made it very clear that that was him in the pictures, yes, sir.

12

Q. And that he admitted it?

A. Yes, sir.

. . . .

Q. So after you show the photos, he does speak about these robberies.

A. Yes, sir.

Q. And committing them.

A. Yes, sir.

The final witness to testify was Dr. Patrick Hayes, an expert in the field of psychiatry and forensic psychiatry. Dr. Hayes testified that Defendant was not insane in the courtroom and was not insane at the time of the offense.[2]

*Defendant's Argument in Brief*

Defendant contends the "identification in this case is based on vague references to video and Mr. Shepherds [sic] ambiguous replies to questions and comments by police." Defendant argues:

> Fontenot's testimony made it sound clear and conclusive, as if there was a full confession. However, in the actual video of the interview, there is no clarity (Exhibits Introduced At Trial – S-12). In fact, the interview suggests that Mr. Shepherd is exhausted, denies the robberies, says he doesn't know about them and then tells Fontenot how hard being homeless and broke has been. Mr. Shepherd was making excuses for his drug abuse, but police used his failure to vigorously deny to suggest he was confessing. But it was not that, despite officer Fontenot claiming body language and a failure to deny made the statement inculpatory.

Defendant notes that Sergeant Fontenot was allowed to testify over defense counsel's objection that Defendant "made it clear" during the interview that he committed the robberies. Defendant maintains this allowed the State "to have the detective embellish the video by saying Shepherd spoke about the robberies and

---

[2] Although Dr. Hayes testified at length, his testimony is not relevant to the issue of Defendant's identity. The purpose of Dr. Hayes' testimony was to rebut Defendant's plea of not guilty by reason of insanity.

committing them." According to Defendant, "[t]his prejudicial re-interpretation misled the jury and is inconsistent with the recorded statement, which was not nearly as conclusive as the witness claimed." Defendant concludes:

> What happened in this case is the white shirt blue shorts were the only evidence. Once police found somebody with that very common outfit, they pushed to convict Mr. Shepherd. A very groggy and tired Kendrick Nelson Shepherd spoke about his problems as a homeless man and a drug addict, which the state interprets in this case as a confession. That is an unreasonable stretch

### *State's Argument in Brief*

The State asserts that even though the victim of the July 26, 2018 robbery could not identify Defendant at trial, the victim identified a video (S-1), which clearly showed Defendant robbing him. As the State asserts, this video, which was not fuzzy or grainy, was shown to the jury. Defendant was arrested, the State contends, when Corporal Ryan Gaspard saw Defendant walking in the middle of a roadway and recognized him as the robbery suspect. Corporal Gaspard recognized the blue shorts Defendant was wearing as the same shorts the robbery suspect was wearing. Additionally, Corporal Gaspard recognized Defendant's build as fairly skinny. As the State also notes, Corporal Gaspard told the jury that on the way to the police station, Defendant guessed that he was being detained because of the robberies. The State further contends:

> Once at the police station and confronted with the still shots of the robbery, the defendant nodded his head in acknowledgment that he had committed the robbery. He confirmed that he got the beer so that when the cashier opened the register he could grab the money. He states that it is not his intention to hurt anyone, but just to get enough to survive.

The State further contends that the shorts worn by Defendant during the robbery and later when he was arrested were unique shorts with identifying characteristics.

14

*Analysis*

As previously stated, Defendant challenges the proof of his identity as the perpetrator of the July 26, 2018 robbery. We find this claim has no merit. The jury saw the video surveillance of the robbery, which clearly showed the robber's face, clothes, and build. The jury also saw Defendant's video recorded interview. Thus, the jury was able to make its own determination as to whether the same individual was in both videos. Additionally, the jury heard Corporal Gaspard testify that he arrested Defendant because he recognized the clothes he was wearing and his build from the "BOLO" sent out after the robbery. The jury then heard Corporal Gaspard testify that Defendant fled when told to place his hands behind his back. Once in the police unit, Corporal Gaspard told the jury, Defendant guessed that he was being arrested because of the robberies.

Finally, the jury watched Defendant's police interview, wherein Defendant did not deny committing the robbery and offered the excuse that he was homeless and needed to get anything he could by any means. Although Defendant claimed to not remember what happened during the robbery, Defendant also stated that his intention was to get money for food. When confronted with the fact that there was a victim in the robbery, Defendant agreed and explained that he attempts to go in and out, without bothering anyone. Defendant acknowledged that he showed a violent tendency by hitting the clerk in the head with a bottle. Defendant further explained that his girlfriend knew he was homeless but did not know that he had been "pulling these little acts" to try to eat. Lastly, after identifying the other person in the video leading up to the robbery, Defendant answered "yes" when Sergeant Fontenot asked if Defendant got in the car with this person after the robbery.

Considering the foregoing, we will not second guess the jury's finding that the state negated "any reasonable probability of misidentification" that Defendant

15

committed the robbery in question. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In this assignment, Defendant contends the trial court erred in "overruling objections to a jail psychologist testifying as an expert and in a narrative including comments on video evidence." The expert in question was Dr. Patrick Hayes, who was qualified as an expert without objection. Defendant further contends Dr. Hayes gave his opinion on key issues in the case.

Defendant takes issue with various parts of Dr. Hayes' testimony. First, Defendant notes that Dr. Hayes was a member of the sanity commission and employed by the Calcasieu Parish Sheriff's Department as the Clinician in Charge at the Calcasieu Correctional Center. Although Dr. Hayes initially evaluated Defendant's capacity to assist in his defense, Dr. Hayes testified at trial regarding Defendant's mental state at the time of the offense and at trial.

Additionally, Defendant asserts that Dr. Hayes used examples of the dramatic behavior of other defendants in court to illustrate to the jury what incompetence looked like. According to Defendant, Dr. Hayes "insisted that the wild animal in a court room was the best way to determine sanity at the time of the crime." Defendant argues that "Dr. Hayes misled the jury with horror stories of madmen in court, as if that is the only basis for forensic insanity."

Defendant concludes his argument in this assignment of error as follows:

[H]e narrated the actual video of the crime, leading off with "as Kendrick approached, just watch his behavior", thereby telling the jury the man in the video was the defendant. This testimony solidified the state's theory by having an expert take the role of the jury and observing that the state was right about identity and sanity. All despite the actual diagnosis of normal mental health in "a controlled environment", and his caveat that ". . . only sobriety is required to preserve durable competency throughout the court process". The bias is most dramatic

16

in this excerpt from the narration of the first Robbery and the identification provided by the doctor to the jury:

> He places the beer on the counter. Mr. Shepherd is left handed. You can tell from it from [sic] the interview video later. So it does appear that he looks at the doors. Looks up at the top of the screen. At a minute 40 there, it looks like he's glancing at the door he entered through. Now watch the left hand. So it flips over in preparation for the cash drawer to be opened. So pause it there for me. That's important because again, back to the gentlemen that is a wild beast in the room and he doesn't know what's going on.

It would be hard to find a more prejudicial expert witness testimony. It is not in fact a discussion of Mr. Kendrick Nelson Shepherd's mental health so much as it is a narrative to resolve for the jury the lack of identification evidence and to pre-empt any discussion of insanity at the time of the offense. The state's last minute surprise use of this biased witness was unfair and unexpected, since Haney [sic] had done only an evaluation for whether Mr. Shepherd could understand the trial process.

### State's Argument in Brief

The State notes that Defendant never objected to Dr. Hayes' manner of testimony. According to the State, there were no objections that Dr. Hayes overstepped his area of expertise, went beyond the scope of his expertise, or expressed an opinion as to Defendant's guilt or innocence. Therefore, the State contends, Defendant waived review of these claims.

Addressing the merits of Defendant's claim, the State notes that four days before the commencement of trial, Defendant was allowed, over the State's objection, to withdraw his plea of not guilty and enter a plea of not guilty and not guilty by reason of insanity. The State maintains this last minute change of plea required the State to seek an expert to prove Defendant was not insane at the time of the offense. The State argues:

> In this case, the defendant was seen on video committing the robbery and he confessed to committing said robbery; video of both the robbery and the confession were played for the jury. Dr. Hayes did not give testimony outside the areas of his stated expertise, and he did not give an opinion on the ultimate issue of the defendant's guilt or

17

innocence. Any error alleged would amount to harmless error. This defendant is entitled to no relief.

*Analysis*

We find Defendant has waived the claims raised in this assignment of error. Although Defendant cites to an objection and implies the objection involved the claims he raises in this assignment of error, the objection cited did not involve the same issues raised by Defendant on appeal. Rather, the objection involved Dr. Hayes' mention of other crimes evidence:

> He just introduced other crimes in reference to a gun, which is not a part of the 404(b) that's approved. You can't un-ring a bell. The jury heard it. At this time, I'm moving for a mistrial; [] it's their witness, their direct.

The parties then discussed whether a mistrial should be granted, or an admonishment be given. The trial judge gave an admonition to the jury. The only other objection to Dr. Hayes' testimony was another objection to Dr. Hayes' mention of other crimes' evidence.

Since Defendant did not assert an objection during Dr. Hayes' testimony regarding any of the issues he asserts in this assignment of error, Defendant is precluded from asserting these claims for the first time on appeal. La.Code Crim.P. art. 841. *See also State v. Peterson*, 96-1663 (La.App. 3 Cir. 6/4/97), 696 So.2d 211, *writ denied*, 97-1742 (La. 11/26/97), 703 So.2d 644 (Defense counsel's failure to timely object to expert's testimony prohibited court of appeal from considering claim that the expert gave an opinion on the ultimate issue in the case).

Accordingly, this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER THREE

Defendant claims the trial court erred in failing to declare a mistrial when Dr. Hayes, the State's witness, told the jury he used a weapon in a prior offense.

18

During the State's questioning of Dr. Hayes, the following colloquy took place:

> Q.     You mentioned previously when you discussed with him, when you made this competency evaluation on that date, I believe you previously mentioned discussing the charges with him. Did you do that?
>
> A.     Yes, sir. That is part of the Bennett Criteria to ask a patient or a person, defendant, if they know what they're charged with, if they know the seriousness of that, if they have a general sense of how they should be defended against, yes, sir.
>
> Q.     Could you describe to the jury how that conversation went or what you recall from that assessment?
>
> A.     Yes, sir. It's almost three years ago, so I'm going to have to reference back to my records. There's a lot of water under that bridge. This is pre-Covid, pre-storms.
>
> So the actual first Bennett Criteria that I need to respond to is does the defendant understand the nature of the charge. Mr. Shepherd had told me, "Simple robbery twice and they enhanced one to armed, and a pistol charge. I was fighting that one."

Defense counsel immediately requested to approach the bench and moved for a mistrial:

> He just introduced other crimes in reference to a gun, which is not a part of the 404(b) that's approved. You can't un-ring a bell. The jury heard it. At this time, I'm moving for a mistrial; and it's their witness, their direct.

When the trial judge asked the State if it knew this information was in Dr. Hayes' report, the State replied that it did not, although it did "peruse" the report the night before. The State explained that it intended to "just get into these charges[,]" to which defense counsel responded, "Your witness, your examination." Defense counsel argued that an admonition would not be sufficient.

When the trial court asked the State if it knew there was a gun mentioned in the report, defense counsel interjected, "Yes[,]" and the following colloquy ensued:

> MR. WILLIAMS [counsel for the State)]:

He's been having to sift through a lot of inadmissible things, Judge, is the issue. I assumed, honestly, that they were waiving a lot of objections to prior incarceration of pending charges because of their injecting the sanity issue and sending him tons of jail records.

THE COURT:

Yeah, but there hasn't been a gun mentioned at all throughout these proceedings; and there shouldn't be a gun mentioned throughout these proceedings. Y'all better tell your witness not to mention a gun. I mean, that's basic. If there's no gun involved in this case, you better tell him don't mention a gun.

I don't know what - - why are you going through this exercise with him? What are you wanting to elicit in the discussion you're having with him?

MR. WILLIAMS:

My very next question, Judge, was did he admit to committing this robbery.

. . . .

MR. CASANAVE[(counsel for Defendant)]:

They will never get a more skilled and experienced witness, a more skilled and experienced State's witness. As he himself said, he has testified hundreds of times on hundreds of cases; and mostly on this sort of thing, on people accused of crimes and all that.

If they didn't tell him or didn't discuss with him, their witness, who they choose to bring in the case in chief, about a handful of blatant things they shouldn't talk about, like a gun; that's on the State. There is no admonishment that says it can remove all those things said a gun [sic].

MR. WILLIAMS:

Well, he said one thing.

THE COURT:

Well, but you know what, but the thing is, the fact that he may have had a gun at some point, you know. The thing is, there's no gun, but he said hey, look. I want to fight that charge or whatever. But he did say something about wanting to fight that or whatever. I think that's vague.

In other words, he didn't say, hey, here's the thing about the pistol, but I'm going to fight that or whatever.

20

There's no indication that he robbed anybody with a gun because there's no robbery charge involved here that involves a gun. I just don't want there to be - - and there's no indication that there's necessarily a - - there isn't any indication that there was even a crime involving a gun would be that he just said, I guess other than potentially he's not supposed to have one possibly; because he said, hey, there's that pistol charge, but I'm going to fight that.

In other words, there's no indication necessarily that he used a gun or a pistol in a crime. He said there's the pistol charge, but I'm going to fight it. In other words, there's no indication of a specific crime involving a gun. So in other words - -

MS. WAMBSGANS[(counsel for Defendant)]:

He said there are two charges. One got enhanced to an armed robbery, and that I had a gun.

THE COURT:

That's not what Dr. Hayes just said.

MR. WILLIAMS:

There's also a pistol charge, and I'm going to fight that.

MS. WAMBSGANS:

That statement was made after he said, "The robbery charge was enhanced to an armed robbery."

MR. WILLIAMS:

That's why I think he's talking about different charges. I think a very clear, direct admonishment that they are to disregard the mention of a firearm that is not involved in this case and it's clearly not been presented as evidence in this case; and that should be disregarded.

MR. GUELZOW[(counsel for the State)]:

Don't say anything other than the two robberies. That way you don't repeat the word firearm or pistol or anything like that. Just saying the jury should disregard anything about any other charge other than the two robberies you just heard about.

THE COURT:

Well, I was just going to say, the only - - yeah, I don't want to mention the word pistol again. I'm just going to say, yeah.

21

I think an admonition under 771 is appropriate under those stances [sic], and I'm just going to tell the jurors that - - I guess I'm going to just say that - - I'm trying to think how I would say that.

Defense counsel stated that he was convinced that the jury had "in their head a picture of Kendrick Shepherd with a gun right now." The trial court replied:

THE COURT:

Well, I understand, but I'm going to - - but I don't think that there's a specific crime associated with a - - what he said, and I think that's the reason that a mistrial is not required at this time, is because he just mentioned the pistol. He didn't mention - -

MR. WILLIAMS:

Your Honor, if I may interject. He mentioned a pistol charge.

MS. WAMBSGANS:

Yeah.

MR. WILLIAMS:

I think he clearly differentiated that that was a separate charge.

MS. WAMBSGANS:

Yeah. It was in regards to a charge.

MR. WILLIAMS:

He said then there's a pistol charge.

MS. WAMBSGANS:

That he was going to fight.

MR. WILLIAMS:

He very clearly differentiated it.

THE COURT:

That's the thing.

MR. CASANAVE:

Your Honor, it's right on the heels of talking about a couple of robberies; and I'm not sure every juror properly hears that transition that clearly Mr. Williams hears incredibly clearly.

The trial judge summarized his ruling as follow:

After a Bench conference, and we heard both sides of this matter - - if I would have mentioned that charge or if the District Attorney or another court official would have made that comment or would have mentioned that pistol charge, then a mistrial would have been mandatory under article 770.

But under article 771, having reviewed that article, obviously I've had to grant mistrials in the past because a witness has said something that required a mistrial because of the nature of what was said. So an admonition isn't always something that can be used to fix something as mentioned in front of a jury.

In any event, I believe that an admonition is sufficient; so I'm going to sustain the objection made by the Defense, but I'm not going to grant the mistrial. I'm going to deny that motion, but I am going to do an admonition to the jury with regard to the pistol comment; and I'm going to ask Dr. Hayes if there's anything else referencing any guns or pistols.

The trial judge also admonished Dr. Hayes to not mention the pistol or any gun.

In stating Defendant's objection, defense counsel asserted:

MR. CASANAVE:

First of all, Your Honor, obviously we object to the denial of the mistrial. We would point to the last paragraph of article 771 about admonitions where it says, "In such cases on motion of the defendant, the Court may grant a mistrial if it is satisfied an admonition is not sufficient to assure the defendant a fair trial."

We have great concern than an admonition not only won't cause anybody to disregard anything. It might cause greater attention to the statement that should have not been made. Therefore, we think a mistrial is proper.

Further, Dr. Hayes is a unique witness. He is one of the primary medical providers for the jail, for the Sheriff, especially under psychiatric matters.

Therefore, he's practically an agent of the State himself; and because of that I believe he falls under 770, even if not in the explicit language by inference, that he is more or less an officer of the Court and the State and the system.

23

In response to defense counsel's argument, the trial court stated that it did not believe the legislature intended to expand the definition of court officials in Article 770 "beyond the immediate court staff or whatever the case may be." When the jurors returned, the trial court admonished them as follows:

THE COURT:

Ladies and Gentlemen, before we get back on the record, I just need to say I'm going to sustain the objection and just admonish that any comments that you have heard about anything other than the two robbery charges that y'all have heard testimony about this week, you are to disregarded [sic][.]

*Defendant's Argument in Brief*

Defendant argues the trial court erred in limiting its ruling to La.Code Crim.P. art. 770, without considering the permissive grounds for a mistrial set forth in La.Code Crim.P. art. 775. Defendant further contends that "[t]he admonition given by the court was vague and ineffective in that it did not order the jury to ignore the specific comment, and to exclude it from their deliberations."

*State's Argument in Brief*

The State first counters an argument made by defense counsel at trial—that Dr. Hayes is "practically an agent of the State[,]" triggering a mandatory mistrial pursuant to La.Code Crim.P. art. 770. The State argues that Dr. Hayes testified as an expert witness and was not a court official. Acknowledging that the mandatory mistrial provisions may apply if an impermissible reference to other crimes evidence was deliberately elicited by the State, the State notes that no such accusation has been made. To the contrary, the State argues, defense counsel accused it of failing to properly prepare Dr. Hayes. Thus, the State contends the mandatory mistrial provisions did not apply.

As for Defendant's claim that the discretionary grounds for a mistrial set forth in La.Code Crim.P. art. 775 should apply, the State contends Defendant fails to show

24

that he did not receive a fair trial because of Dr. Hayes' comment. Finally, the State addresses Defendant's argument that the trial court's admonition was not sufficient because "it did not order the jury to ignore the specific comment, and to exclude it from their deliberations." The State notes that defense counsel specifically requested the trial court to not mention the specific comment when it admonished the jury. Consequently, the State argues the trial court did not abuse its discretion in admonishing the jury rather than granting a mistrial.

*Law and Analysis*

Louisiana Code of Criminal Procedure Article 770 states the following regarding the circumstances under which a mistrial must be ordered:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
>
> . . . .
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

A mandatory admonition and permissible mistrial, on the other hand, are provided for in La.Code Crim.P. art. 771:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

25

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

A mistrial is also mandated by La.Code Crim.P. art. 775, which provides, in pertinent part:

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

Since the remark in the present case was not made by the judge, district attorney, or a court official, an admonition, rather than a mistrial, was required, unless the trial court found an admonition was not sufficient to assure the defendant a fair trial.[3]  La.Code Crim.P. art. 771.  Recently, this court addressed whether a mistrial should have been granted when a detective testified as to other crimes evidence:

Defendant next asserts that the trial court erred when it did not grant a mistrial upon Detective Cammack testifying as to "other crimes evidence" allegedly committed by Defendant. More specifically, during the trial, Detective Cammack was asked by the representative of the State if he questioned Defendant regarding whether she had any information concerning the victim, Lachney. Detective Cammack responded "Yes", and then proceeded to state "[Defendant] said they got up the next morning early. She said they went and purchased . . . to Echo and purchased some crystal meth." Defense counsel objected and moved for a mistrial. Although the motion for mistrial was denied, the trial court did admonish the jury to disregard the statement.

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

---

[3]Although Defendant's appellate counsel mentions defense counsel's objection at trial that Dr. Hayes was an agent of the State, no such argument is made by appellate counsel.  Thus, this argument is considered abandoned.  Uniform Rules, Courts of Appeal—Rule 2-12.4(B)(4).

26

. . . .

> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

La.Code Crim.P. art. 770.

Defendant concedes that the statement was not made by the judge, district attorney, or court official so as to warrant a mandatory mistrial pursuant to the code. *Id*. Louisiana Code Criminal Procedure Article 771(2) provides that when a remark or comment is "made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770[,]" the trial court shall admonish the jury to disregard the remark when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury. This applies to such comments on other crimes evidence by law enforcement officers. "In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." *Id.*

> An investigating officer is a witness, but is closely related to the district attorney in presentation of the prosecutor's case. Therefore, a prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial, and may require granting a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. Nevertheless, the decision as to the necessity of granting a mistrial in these circumstances was left to the sound discretion of the trial court. See *State v. Madison*, 345 So.2d 485 (La.1977); *State v. Brown*, 322 So.2d 211 (La.1975); *State v. Schwartz*, 354 So.2d 1332 (La.1978). The present case does not reveal a manifest abuse of discretion warranting the substitution of our judgment for that of the trial judge who conducted the trial, heard the remark, and was in the best position to assess its impact.

*State v. Douglas*, 389 So.2d 1263, 1266 (La.1980).

In this case, we find no error in the trial court's decision to admonish the jury to disregard the statement rather than grant a mistrial. The statement clearly fell under the umbrella of La.Code Crim.P. art. 771's discretionary mistrial provisions. We find no abuse of that discretion here.

*State v. Rabalais*, 20-303, pp. 29–31 (La.App. 3 Cir. 4/7/21) (alterations in original) (unpublished opinion) (2021 WL 1295020).

Likewise, Dr. Hayes' reference to Defendant's statement regarding a pistol charge falls within the umbrella of La.Code Crim.P. art. 771's discretionary mistrial provisions. Considering the brevity of Dr. Hayes' reference to a pistol as well as its uncertain association to the armed robbery charge, we find Defendant has not shown that a mistrial, rather than an admonition, was warranted. As for Defendant's claim that the trial court's admonition was vague and ineffective because it did not order the jury to ignore the specific comment, Defendant not only failed to raise such argument in the trial court, but made known its concern that the admonition would draw more attention to the pistol reference. At one point, defense counsel asserted:

> We have great concern that an admonition not only won't cause anybody to disregard anything. It might cause greater attention to the statement that should have not been made. Therefore, we think a mistrial is proper.

Thus, we find Defendant waived any argument that the admonition should have instructed the jury to ignore the specific comment made. La.Code Crim.P. art. 841.

For the foregoing reasons, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FOUR**

In this assignment of error, Defendant contends the trial court erred when it questioned him about whether or not he would testify. Defendant asserts that such a decision is solely up to the client and his lawyer, and "intervention by the court on the record in the presence of the prosecutor carries the potential for prejudice." Defendant acknowledges there was "not a full throated objection" by trial counsel but claims that trial counsel interrupted the trial court by stating, "Your Honor, we might do something else[.]" Lastly, Defendant suggests this court should address the error, despite the fact that it was not preserved for review, because "[t]his

28

intervention in the attorney-client relationship is problematic and prone to open the proceedings to controversial prejudicial error."

*State's Argument in Brief*

The State contends the trial court acted within its authority and responsibility to maintain order in the courtroom:

> Considering the numerous outbursts and difficulties that the trial court had in maintaining decorum with regards to this defendant, the trial court was well within his inherent powers to inform the defendant of his rights. Nothing that the trial court stated regarding the defendant's right to testify prejudiced this defendant or hindered his defense. And the defendant fails to point to any errors or areas of concern, instead providing hypothetical questions that are not at issue here. The trial court committed no error and this claim does not warrant relief.

*Proceedings at Trial*

During a recess at trial, the trial court stated the following:

THE COURT:

> Mr. Shepherd, I want to go ahead and visit with you for a second. I'm required to go over - - I'm required to have a colloquy or a discussion with you on the record. I'm kind of having it - - since we have time, I'm not waiting until the last second to have a discussion with you.

> I'm going to have it again tomorrow, but I'm actually giving you more time to think about it in having a discussion earlier than I normally do; because we have more time because of the way the gap in the witnesses are falling.

> You have a constitutional right to testify. You have a constitutional right to not testify. That is your call.

> Normally that decision is made after consultation with your Lawyer or Lawyers about the pros and cons of testifying verses [sic] not testifying, and kicking that issue around, discussing it with your Lawyers, and kind of making the decision about whether it's in your interest to do it or not do it.

> I'm going to ask you - - the time for me to get a final decision from you is after the State rests their case; and they're going to rest their case tomorrow morning after Dr. Hayes testifies.

> After they do that, I'm going to ask - - I'm going to give the jurors a few minutes. I'm going to go ahead and give them a recess. After

29

they rest their case, I'm going to take a short recess; and I'm going to have this conversation with you.

I'm going to ask you if you've had a chance to discuss the issue with your Lawyers about your right to testify or not testify, and if you've had a chance to think about it yourself.

I'm going to ask you to tell me whether you've had that chance, had that opportunity to have that discussion; and then I'm going to ask you if you've made a decision. Then I'm going to ask you what your decision is.

If you decide to testify, we'll bring the jurors back in, you'll testify. If you decide not to, you'll tell me that and then I will go ahead and that will be on the record also.

In other words, that discussion is required by law to be on the record one way or the other, that you and I have this conversation and I explain your rights to you on the record with regard to that and you can tell me whether you do or you don't want to testify.

The jury doesn't know and that's outside of the presence of the jury; so the jurors don't know that we had that conversation. They don't know what your decision is. They just know that you have a right to remain silent, because we told them that in jury selection.

Then when they come back in after the break and they're sitting in that Box, all I'm going to do is say, Okay. Defense, do y'all have anything to put on? If you've chosen to remain silent and not testify, then your Attorneys will say, no, Your Honor; and I'll say okay.

MR. CASANAVE:

Your Honor, we might do something else.

THE COURT:

Well, that's true, exactly. You may have other evidence. You might say, yeah. We're going to call whoever to testify. You may have other witnesses to call, but you may have - - or whatever.

When it comes time for you to testify, they just won't call you and that's fine, because we will have already had that conversation on the record and the jurors will assume that you are exercising your right to not do it, as they've already agreed and understood that you have that right.

I'm required to have that conversation with you on the record outside of their presence; so that's what we'll do in the morning.

30

I'm letting you know now that we're going to have that conversation and for you to talk to your Lawyers and be thinking about it. I'm just giving you a head's [sic] up.

The trial court then asked Defendant his age (thirty-five) and how far he went in school (graduated high school). Defendant answered "[y]es" when asked if he could read and write the English language. When the trial court stated that they were recessing for the day, defense counsel stated that he would go to the jail and visit with Defendant about his decision. The trial court then stated:

THE COURT:

Okay. That sounds good. We'll go ahead and do this charge conference and then your Lawyers can go meet with you and talk about everything, okay?

MR. SHEPHERD:

Yes, sir.

The next day, the following colloquy took place:

THE COURT:

So Mr. Shepherd, did you have a chance to speak with your Attorneys about your right to testify and not testify in your own defense in this case?

MR. SHEPHERD:

Yes, sir, both of them, I did.

THE COURT:

And you and I discussed it yesterday afternoon so that you would have time to start thinking about it and discussing it with your Attorneys. Did you - - I will just kind of recap what I mentioned to you yesterday. You have the right - - there are pros and cons to testifying and not testifying; and you had a chance to discuss with your Lawyers any potential benefit to testifying versus not testifying; is that correct?

MR. SHEPHERD:

Yes, sir.

THE COURT:

31

Did you feel like you had a chance to get your questions answered by discussing that issue with your Attorneys?

MR. SHEPHERD:

Yes, sir. They did properly fine.

THE COURT:

Have you made a decision about whether you want to testify?

MR. SHEPHERD:

Yes, sir, I have.

THE COURT:

What is your decision?

MR. SHEPHERD:

I would not like to testify.

In response to the trial court's questions, Defendant stated that his date of birth is October 25, 1986, that he graduated from Westlake High School, and that he can read and write the English language. The trial court then stated that it found Defendant made a knowing and intelligent decision "based on consulting with Counsel." Defendant's attorneys stated that they had both visited with Defendant regarding his decision, one meeting with him twice.

*Law and Analysis*

As acknowledged by Defendant, there was no objection to the trial court's questioning of Defendant regarding his right to testify. Thus, we find Defendant is precluded from seeking review of this issue. La.Code Crim.P. art. 841. Additionally, even were this court to address the error because it involves such a protected constitutional right, Defendant has failed to show any error occurred. The supreme court stated the following when addressing a similar inquiry by the trial judge as to the defendant's right to testify:

32

In his only other assignment of error to this court, defendant complains that the trial court improperly interjected itself into the defendant's decision to waive his right to testify in his own defense when the court asked the defendant, outside the presence of the jury, whether he wished to testify. Defendant asserts that the trial court's inquiry deprived him of a fundamentally fair trial by inducing his decision not to take the stand.

After the State called its last witness, the trial court excused the jury to resolve an objection to certain documentary evidence. The following colloquy ensued:

> THE COURT: For the record the jury is outside the courtroom. I think Mr. Hall is about ready to rest. Ms. Harried, I need to—so I don't have to run the jury back outside the courtroom, I need to know whether or not your client intends to take the witness stand. And if not, I need his statement for the record as to the fact that he chooses not to testify.

> MS. HARRIED: Your Honor, I have had an opportunity to speak with Mr. Shaw. I have told him that it is my advice that he not take the stand. I have explained what dangers he faces if he takes the stand. I've explained to him that his entire criminal history would come out in front of the jury. In fact, I would have to ask him prior to Mr. Hall cross-examining him so that it did not look like we were hiding anything from the jury.

> I explained to him the dangers that he would face on cross-examination and how I thought that that may impact the jury. He agreed with my assessment, and he agreed that he did not wish to testify.

> THE COURT: Mr. Shaw, is that correct?

> MR. SHAW: Yes, sir.

> THE COURT: Your lawyer has explained the advantages and disadvantages of testifying verus[versus] not testifying. And my understanding is that your choice is that you not testify.

> MR. SHAW: Yes, sir.

An accused's right to testify is a fundamental right of constitutional dimension. *Rock v. Arkansas,* 483 U.S. 44, 51–53, 107 S.Ct. 2704, 2710, 97 L.Ed.2d 37 (1987); *State v. Hampton,* 00–0522, pp. 4–5 (La.3/22/02), 818 So.2d 720, 723–724. Because the right is personal, it may be relinquished only by the defendant, and the

defendant's relinquishment of the right must be knowing and intentional. *Hampton,* 00–0522 at 7, 818 So.2d at 725.

In *Hampton*, this court established a framework for determining whether a defendant's right to testify was violated or waived by his silence during trial. In doing so, a plurality commented in dicta that absent extraordinary circumstances that should alert the trial court to a conflict between attorney and client, the court should not inquire into a criminal defendant's right to testify; rather, the court should assume that a criminal defendant, by not attempting to take the stand, has knowingly and voluntarily waived his right. *Hampton,* 00–0522 at 14, 818 So.2d at 729, *quoting Passos–Paternina v. United States,* 12 F.Supp.2d 231 (D.P.R.1998).

It is firmly established that a trial judge may not *actively* interject himself into the defendant's decision, aided by input from his attorney, whether to testify in his own defense because judicial interference with this strategic decision poses a danger that the judge will appear to encourage defendant to invoke or waive this right. *United States v. Joelson,* 7 F.3d 174, 178 (9th Cir.1993). For this reason, the federal courts subscribe to the rule that a trial court has no duty to advise the defendant of his right to testify, or to ensure that an on-the-record waiver occurs. *Joelson,* 7 F.3d at 177. However, the absence of a duty in this regard clearly does not mean that a court does not have the discretion to conduct an on-the-record waiver outside the presence of the jury, so long as the court does not interject itself into the strategic decision made by the defendant with advice from his counsel.

Nevertheless, defendant argues that in the absence of any indication of a disagreement between counsel and defendant, the trial court erred in conducting this inquiry into his decision to waive his right to testify in his own defense, and, further, that this inquiry was presumptively prejudicial, requiring the reversal of his conviction. The defendant additionally argues the trial court's timing of its inquiry, shortly before the State rested its case, also inappropriately affected his decision to forego testifying, compounding the error.

We disagree. A review of the exchange between defendant and the trial court reveals no evidence of improper influence. The inquiry was an entirely neutral one in which the court neither urged nor prevented the defendant's testimony. Although the court's inquiry came after the State called its last witness but before it formally rested, there is no indication that the *timing* of the inquiry impacted the defendant's decision to waive his right to testify. That waiver appears on the record in unequivocal terms. In response to a benign inquiry from the trial court, devoid of any indicia of coerciveness, the defendant unhesitatingly waived his right to testify and further indicated that he discussed his waiver with his attorney.

Under these circumstances, there is simply no evidence from which this court could conclude that the defendant's right to testify in

his own defense was violated or that the trial court impermissibly discouraged the defendant from testifying. This assignment of error is without merit.

*State v. Shaw*, 06-2467, pp. 21–23 (La. 11/27/07), 969 So.2d 1233, 1246–47 (footnote omitted) (emphasis in original).

As in *Shaw*, the trial court's inquiry in the present case was a neutral inquiry, with no indication that the trial judge either urged or discouraged Defendant's testimony. The trial court's colloquy with Defendant in the present case focused on informing Defendant of the procedural, not substantive, aspects of his decision. The trial court left it up to Defendant's attorneys to discuss the substantive issues that must be considered and did not interject itself into the strategic decision made by Defendant. Finally, as the court noted in *Shaw*, the lack of a contemporaneous objection to the trial court's inquiry indicates "that, at the time it occurred, the inquiry was not deemed by either defendant or his counsel to be improper or coercive." *Id.* at 1247. n.8.

For the foregoing reasons, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FIVE**

Defendant contends the trial court imposed a fourth habitual offender sentence on him without stating reasons or factual findings as required by La.R.S. 15:529.1(D)(3). Defendant does not ask this court to vacate the sentence imposed but simply points out that the trial court failed to make a record as required by the "Habitual Offender Act."

It is clear from the supplemental sentencing transcript that the trial court made a specific finding as to Defendant's status as a fourth habitual offender. The trial court then imposed the mandatory life sentence without benefit of parole, probation, or suspension of sentence. To the extent Defendant is alleging error in the trial court's failure to give reasons for this sentence, we note this court stated the

following in *State v. Farry*, 16-211, pp. 14–16 (La.App. 3 Cir. 11/16/16), 207 So.3d

436, 447–48:

> The Defendant contends that the trial court erred in failing to issue written reasons. . . .
>
> . . .
>
> Louisiana Revised Statutes 15:529.1(D)(3) provides:
> .
>> When the judge finds that he has been convicted of a prior felony or felonies, or if he acknowledges or confesses in open court, after being duly cautioned as to his rights, that he has been so convicted, the court shall sentence him to the punishment prescribed in this Section, and shall vacate the previous sentence if already imposed, deducting from the new sentence the time actually served under the sentence so vacated. The court shall provide written reasons for its determination. Either party may seek review of an adverse ruling.
>
> In *State v. Dukes*, 46,029, p. 15 (La.App. 2d Cir. 1/26/11), 57 So.3d 489, 496, *writ denied*, 11–443 (La. 3/2/12), 83 So.3d 1033, the court explained, in pertinent part:
>> Because the sentence imposed for the habitual offender adjudication is prescribed by statute, the trial court's compliance with La.[Code Crim.P.] art. 894.1 is not required. *State v. Thomas*, 41,734 (La.App. 2 Cir. 1/24/07), 948 So.2d 1151, *writ denied*, 2007–0401 (La. 10/12/07), 965 So.2d 396; *State v. Gay*, 34,371 (La.App. 2d Cir. 4/4/01), 784 So.2d 714. It would be an exercise in futility for the trial court to discuss the factors enumerated in that article when the court had no discretion in sentencing the defendant. *State v. Sewell*, 35,549 (La.App. 2d Cir. 2/27/02), 811 So.2d 140, *writ denied*, 2002–1098 (La. 3/21/03), 840 So.2d 535.
>
> Louisiana Code of Criminal Procedure Article 894.1(C) provides: "The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence."
>
> In this case, the trial judge noted that he had no discretion in sentencing as there was one penalty, and he did not articulate reasons. Following, the trial judge imposed the mandatory sentence of life imprisonment without the benefit of parole, probation or suspension of sentence.
>
> . . . , we find the trial court did not err in failing to articulate reasons for the mandatory sentence. This assignment lacks merit.

Likewise, we find the trial court in the present case did not err by failing to articulate sufficient reasons for the mandatory sentence. As indicated in the supplemental sentencing transcript, the trial court noted that the statute required a mandatory life sentence, with "no minimum or maximum." Additionally, as indicated in the transcript included in the original record, the trial court stated that it had reviewed the presentence investigation report, which revealed Defendant's lengthy criminal history. The trial court further stated it saw no reason to deviate from the mandatory life sentence based on the aggravating and mitigating factors under La.Code Crim.P. art. 894.1, Defendant's criminal history, and Defendant's history of violent offenses. Thus, considering the mandatory nature of the sentence, we find the trial court's reasons were sufficient.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed. We order the trial court to correct the original sentencing minutes to delete the reference to the sentencing as a "resentencing." Finally, the original minutes of sentencing should be amended to delete the statement that the case was remanded from the Louisiana Third Circuit Court of Appeal.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**